CHICAGO GREAT WESTERN R. CO. v. POSTAL TELEGRAPH–CABLE CO.

(Circuit Court of Appeals, Seventh Circuit. February 28, 1918.)

No. 2548.

TELEGRAPHS AND TELEPHONES ⬤⟿11—CONTRACT BETWEEN RAILROAD AND TELEGRAPH COMPANIES—"EXCHANGE" OF SERVICES.

In 1888, complainant, a railroad company, and defendant, a telegraph company, entered into an elaborate contract to continue for 50 years, with the privilege of renewals for like successive terms by either party, for the joint operation and maintenance of telegraph lines along the railroad right of way and the exchange of services, which provided, inter alia, that defendant should transmit over its lines on the railroad line all messages relating to railroad business free, and all such messages over its lines off the railroad line free to an amount not exceeding $10,000 per year, at its regular rates, and all messages over that amount at half rates. A corresponding provision required complainant to transport men and materials for defendant for use on its line of road free, and for use off its line of road to an amount not exceeding $10,000 per year free, and above that amount at half rates. The Interstate Commerce Commission having ruled that such contracts with respect to exchange of "off line" services were in violation of the Interstate Commerce Acts, Congress by the amendatory act of June 18, 1910 (36 Stat. 544, c. 309, § 7 [Comp. St. 1916, § 8563]), extended the act to telegraph, telephone, and cable companies, and made it unlawful to charge unjust or unreasonable rates, but provided that "nothing in this act shall be construed to prevent telegraph, telephone and cable companies from entering into contracts with common carriers for the exchange of services," and further that it should not be construed to prevent the exchange of passes and franks between telegraph, telephone, and cable companies and other common carriers for the use of their officers, agents, and employés. *Held:* (1) That such legislation was enacted in the light of public history, showing the interdependent relations between railroads and telegraphs as commercial agencies, and that similar contracts, covering practically all of the railroads in the country, had been in force almost from the beginning, and with intent to legalize the same; (2) that "exchange" of services did not mean that services rendered must be equal in value to those received at established rates, otherwise the provisions were unnecessary and without practical meaning; (3) that there is no basis for distinction between "on line" and "off line" services, especially in view of the fact that cable companies, as to which there could be no exchange of "on line" services, were expressly included.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Exchange.]

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Suit in equity by the Chicago Great Western Railroad Company against the Postal Telegraph-Cable Company. Decree for defendant, and complainant appeals. Reversed.

For opinion below, see 245 Fed. 592.

Ralph M. Shaw, of Chicago, Ill., for appellant.

Jacob Dittus, of Chicago, Ill., for appellee.

Before BAKER, KOHLSAAT, and ALSCHULER, Circuit Judges.

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

BAKER, Circuit Judge.  In 1888 the parties entered into a railroad-telegraph contract for exchange of services.  They renewed it after the 1910 amendment of the Interstate Commerce Act and faithfully observed its terms until after the Interstate Commerce Commission's conference ruling of March 28, 1916.  In essential scope the contract in suit is the same as one set forth in Baltimore & O. Rld. Co. v. Western Union Tel. Co. (D. C.) 241 Fed. 162.  That case (affirmed, same title, 242 Fed. 914, 155 C. C. A. 502) is also referred to for a recital of amendments of the Interstate Commerce Act and of various pronouncements of the Interstate Commerce Commission.

Appellant unsuccessfully prosecuted this suit to enjoin appellee's repeated actions at law to collect full rates for "off line" telegrams and to compel appellee to accept railroad service in exchange under the contract.

As the Western Union Case is pending in the Supreme Court, we have taken this case now only on the representations of the Postal Company that there are important facts in this record which were not adduced in the Western Union Case and that it would be advantageous to have both records before the Supreme Court at the same time.

We find no additional facts that in our judgment enlarge or change the questions for decision.  They arise from the following provisions in the Interstate Commerce Act:

"Nothing in this act shall be construed to prevent telephone, telegraph, and cable companies from entering into contracts with common carriers for the exchange of services."

"This provision [against passes and free transportation] shall not be construed to prohibit the privilege of passes or franks, or the exchange thereof with each other, for the officers, agents, employés and their families of such telegraph, telephone, and cable lines, and the officers, agents, employés and their families of other common carriers subject to the provisions of this act." Comp. St. 1916, § 8563.

We approve and adopt the propositions declared in the Western Union Case, substantially as follows:

(a) "Exchange" means the giving of one thing for another.  It excludes the idea of first measuring the respective things in money value and then settling or paying any difference.  To construe the act in its entirety as requiring a reference to monetary scales is to render the proviso meaningless.  "Exchange" and "services" are without any limitation or qualification put upon them by the language employed by Congress; and therefore the companies may lawfully give, each to the other, any service of the kinds they perform for the public.  As the language is clear, direct and unambiguous, there is no warrant for the interpolation of a distinction between "on line" and "off line" services.

(b) Congress adopted the amendment of 1910 in the light of public history, showing that generations ago the railroad and the telegraph started and have since continued hand in hand as coservitors of the public under the well-known reciprocal contracts which were first challenged a few years prior to 1910.  Congressional purpose in the 1910 amendment, therefore, was to end the challenge.

Additionally we suggest:

(c) Emphasis may be given to "contract" as well as to "exchange" and "service." Full and unrestricted right to contract with each other is what the plain language of the proviso gives. If one may deal with the other for "off line" service only as the Interstate Commerce Act compels carriers to deal with the public, then no contract rights, as distinguished from legislatively declared legal obligations, can exist, and the grant of power is in that respect emasculated.

(d) So entwined and interdependent are the reciprocal obligations and undertakings that no part of the contract is separable from the others. Inasmuch as Congress supposedly was aware of this situation, a confession by appellee that Congress intended to legitimatize the exchange of "on line" services is a confession, in our judgment, that Congress had the intent to approve the known exchange of services rather than the intent to split the unsplittable and from the fragments to make for the parties a new contract.

(e) Telegraph companies were not brought under control to the same extent as railroad companies. For the latter, rates may be fixed; respecting the former, there was only the bringing into national law of the common law requirement that rates be reasonable. If a telegraph company should believe that a published railroad rate for "off line" service was unreasonable, it could go before the Interstate Commerce Commission and that body could fix a reasonable rate. But, places changed, the railroad company could only contest in court the reasonableness of a particular rate for services already rendered, with the telegraph company free to promulgate new rates according to its own judgment of reasonableness. Did Congress intend that this inequality of situation should control? Or did not Congress rather intend that their mutual agreements for exchange of services should prevail?

(f) "Evils to be remedied," as a part of "the history of the times," may be looked to in confirmation of the unambiguous language of the proviso. We perceive no evils in the contracts, no injury to the public; appellee suggests none; and the Interstate Commerce Commission in 1906 reported that:

"So far as we can now see, the full performance of such contracts by the carriers with whom they are made would not affect any public or private interest adversely." 12 Interst. Com. Com'n R. 10.

(g) Appellee is a telegraph company. But cable companies are included in the same terms. Appellee enumerates "on line" services it renders for appellant; but so far has failed to state how an undersea cable could be of "on line" service to a railroad, or how a railroad could be of "on line" service to a cable. Appellee's contention that the proviso authorizes nothing but contracts for exchange of "on line" services (services on a common or joint right of way) therefore comes to this: Railroad and cable companies are authorized to contract with each other, but only for the performance of unperformable conditions.

(h) Appellee's contest arose wholly over compensation for telegraphic messages. Under the second proviso hereinabove quoted ap-

pellee could lawfully issue telegraphic franks to the officers and agents of appellant. But is it unlawful to do under contract and for compensation what may lawfully be done without contract and without compensation?

Decree reversed, with direction to grant the prayers of the bill.